## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WEBBAPPS, L.L.C., D/B/A HITPATH,**<br>**Plaintiff,**<br>**VERSUS**<br><br>**ACCELERIZE NEW MEDIA, INC.,**<br>**D/B/A CAKE MARKETING MOORE,**<br>**L.L.C., MOORE INTERNATIONAL,**<br>**L.L.C., PAB67 MEDIA, L.L.C.,  RYAN**<br>**MOORE, CHRIS KAUTZ-SCANAVY,**<br>**AND AARON HARPER**<br>**Defendants.** | **CIVIL ACTION NO. 11-00780**<br><br>**SECTION "N"**<br><br>**JUDGE KURT D. ENGELHARDT**<br><br>**MAGISTRATE 4**<br><br>**MAGISTRATE KAREN WELLS ROBY** |

### WEBAPPS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS ACCELERIZE NEW MEDIA, INC.'S COUNTERCLAIM

Plaintiff WebApps, L.L.C. ("WebApps") files this memorandum in support of its Motion to Dismiss the Counterclaim asserted by Accelerize New Media, Inc. ("Cake Marketing").

### SUMMARY OF ARGUMENT

When a plaintiff seeks to impose liability on a competitor based on alleged anticompetitive behavior, it does not matter whether the plaintiff labels its causes of action as antitrust violations, unfair trade practices, or other business torts.  If the alleged anticompetitive conduct does not constitute an unreasonable restraint under the antitrust laws, it also is not actionable as an unfair trade practice or other business tort.  *Ocean State Physicians Health Plan,*

{N2339720.2}

*Inc. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101, 1114 (1st Cir. 1989) (antitrust law provides best barometer of whether alleged anticompetitive behavior can be found "wrongful" and hence tortious under state law); *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993) (holding that defendant's conduct that did not violate the antitrust laws was privileged competition and did not give rise to tortious interference claim); *see also Metzler v. Bear Automotive Service Equip. Co.*, 19 F. Supp.2d 1345, 1364 (S.D. Fla. 1998) (citing cases) ("But where the tort is ground on precisely the same 'anticompetitive' behavior alleged in the failed antitrust claim, it cannot as a matter of law constitute tortuous interference with a business relationship."); *Aviani v. Sisters of St. Mary*, 1987 WL 18934 (N.D. Ill. 1987) (same).

In this case, Cake Marketing has patterned its Counterclaim on the counterclaim asserted in *OCE North Am., Inc. v. MCS Services, Inc.*, __ F.Supp.2d __, 2011 WL2443714, *7 (D. Md. June 14, 2011), except it has repackaged the antitrust theories summarily dismissed in *MCS Services* as business torts.  Specifically, Cake Marketing asserts claims for unfair trade practices and intentional interference with contract and business relations under California and Louisiana law based on the allegations that (i) WebApps has made it difficult for customers to switch products by structuring "its customer web portal to make it bewildering, expensive, and time consuming for a departing customer to retrieve all of the data that the customer owns" (Defendant Cake Marketing's Counterclaims and Partial Answer to Complaint; Demand For Jury Trial (Rec. Doc. 25) ("Counterclaim") ¶ 16) and (ii) WebApps "knowingly made false representations to its customers in an email message from its CEO on or around March 29, 2011 to the effect that 'one of its competitors has been unlawfully accessing the Network Admin Panel User Interface of its HitPath Software ('HitPath') for the purpose of misappropriating trade secrets and other valuable confidential and proprietary information.'" *Id.* ¶ 27.  These allegations

are disputed and represent nothing more than a desperate attempt by Cake Marketing to distract from their now admitted efforts to access WebApps' secure web site without authorization or consent.

However, even assuming the truth of the allegations for purposes of this motion, the alleged anticompetitive conduct is not the type of competitive behavior which would foreclose competition and, therefore, is not actionable under any legal theory.  For example, the allegation that the WebApps product is "bewildering, expensive, and time consuming" for departing customers represents nothing more than a competitor's opinion about product quality.  Similarly, an allegation that WebApps does not assist customers transition to new products is nothing more than a competitor's opinion about service quality.  If WebApps is really offering inferior products and services as alleged by Cake Marketing, businesses will turn to rival products forcing WebApps either to go out of business or improve the quality of its products and services.  Likewise, Cake Marketing cannot reasonably complain about WebApps sending an e-mail to its own customers.  First, a single e-mail has no ability whatsoever to foreclose competition as a matter of law.  Second, the e-mail at issue (a full copy is attached as Exhibit 1[1]) was a facially measured response by WebApps to mitigate damages and remind customers about their duties under their licensing agreements with WebApps.  The e-mail did not name Cake Marketing and was directed to WebApps' own customer base.  As such, the e-mail does not in any way disparage Cake Marketing and could not, in any event, restrain competition.  In short, the alleged anticompetitive conduct does not constitute an unreasonable restraint of trade and, therefore, cannot satisfy the elements of an unfair trade practice or intentional interference claim.

---

[1]  Cake Marketing did not attach a copy of the e-mail to its Counterclaim.  However, it is central to their claims and, therefore, may be reviewed in connection with this Motion to Dismiss.  *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

## FACTUAL BACKGROUND

Cake Marketing is a publicly traded company headquartered in Los Angeles, California. In its Counterclaim, Cake Marketing alleges that it has a superior product and that "many WebApps customers have recently chosen to transfer their business from WebApps to Cake Marketing."  Counterclaim ¶ 14.  Cake Marketing also alleges, however, that WebApps has structured its web portal in a way that forces customer "to, in some cases, engage in manual removal, item by item, or figure out some self-generated method to gather the data" and that WebApps does not assist customers transition to new products  *Id.* ¶¶ 17-18, 21. Cake Marketing claims "WebApps could have developed more robust APIs to enable customers to more easily and expeditiously retrieve their data."  *Id.* ¶ 18.  Cake Marketing also claims that WebApps has adopted a "business strategy" of not assisting customers when they want to transition to a competitive product and making "false allegations" by sending an e-mail "to its customers" in which it stated that "one of its competitors has been unlawfully accessing the Network Admin Panel User Interface of its HitPath Software ("HitPath") for the purpose of misappropriating trade secrets and other valuable confidential and proprietary information."  *Id.* ¶¶ 22, 27.  Cake Marketing claims that the alleged conduct imposes "time and labor costs on customers as a disincentive for customers to choose a WebApps competitor" (*Id.* ¶ 36) and has "caused customers to hesitate before conducting business with Cake Marketing."  *Id.* ¶ 40.

Significantly, Cake Marketing does not allege that WebApps' customers were unable to switch from one product to another or that they have, in fact, not switched to new products. Rather, in general, Cake Marketing seems to be claiming that the switching costs for customers are higher than they otherwise would be if WebApps offered better products and service and would not object to Cake Marketing accessing WebApps' secure web site without authorization.

Cake Marketing does not claim that WebApps controls a significant percentage of the market, that customers were ignorant of the alleged high switching costs when they executed their license agreements with WebApps,[2] that WebApps has market power, or that the alleged conduct has foreclosed competition in a relevant market.  To the contrary, as set forth above, Cake Marketing very proudly states that it has a superior product and that "many WebApps customers have recently chosen to transfer their business from WebApps to Cake Marketing."  *Id.* ¶ 14.

## LAW AND ARGUMENT

The Court should dismiss a claim pursuant to Fed. R. Civ. Pro. 12(b)(6) when there is no cognizable legal theory to support the claim, or when there are insufficient factual allegations to support a cognizable legal theory.  The Court may not assume that Cake Marketing can prove facts that it has not alleged and must determine whether the facts pled are sufficient "in light of common economic experience."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).  Cake Marketing's claims for unfair trade practices and intentional interference boil down to a single, fundamentally-flawed premise:  WebApps has restrained its *own* customer base by not providing its customers with the tools to transfer their data to competitive products easily.

---

[2]   Cake Marketing alleges that WebApps does not inform customers about its alleged tactics at the time of contracting.  Counterclaim ¶ 37.  Cake Marketing also alleges that "WebApps does not advertise any data retrieval service for departing customers."  *Id.* ¶ 17.  However, these allegations say nothing about whether customers have knowledge of the switching costs.  The customers at issue are not average consumers.  They are sophisticated users of technology and, according to Cake Marketing, their data represents a significant asset.  As such, customers had the ability and incentive to understand the costs associated with switching to a new product before making a purchasing decision.  Under these circumstances, the facts alleged by Cake Marketing do not support a conclusion that information costs are high.

A.   **The Unfair Trade Practice Claims (Counts 2 and 4) Fail As A Matter Of Law Because Competition Is Not Harmed By Products With High Switching Costs Except In Very Limited Circumstances Not Present In This Case.**

In this case, Cake Marketing has asserted the same counterclaims which were asserted in *OCE North Am., Inc. v. MCS Services, Inc.*, __ F.Supp.2d __, 2011 WL2443714, *7 (D. Md. June 14, 2011), except it has repackaged the antitrust claims in *MCS Services* as violations of the California Business & Professions Code § 17200 and Louisiana Unfair Trade Practices Act, LA-RS: § 51:1405.[3]   However, like the antitrust laws, the main thrust of both the California and Louisiana unfair trade practice statutes is to deter injury to competition and a determination that conduct does not constitute an unreasonable restraint of trade necessarily implies that the conduct is not an unfair trade practice.   *See Omnitech International, Inc. v. Clorox Co.*, 11 F.3d 1316, 1331 (5th Cir. 1994) ("The real thrust of the LUPTA, modeled after the Federal Trade Commission Act, 15 U.S.C. § 34, is to deter injury to competition."); *Cal-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 187, 83 Cal. Rptr.2d 548, 973 P.2d 527 (1999) ("When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law . . . ."); *Chaves v. Whirlpool Corp.*, 93 Cal.App.4th 363, 375, 113 Cal.Rptr.2d 175 (2001) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason – because it unreasonably restrains competition and harms consumers – the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers.").   As such, the unfair trade practices claims in this case should face the same fate as the antitrust theories in *MCS Services* even though the claims have different labels.

---

[3] Like this case, the plaintiff in *MCS Services* alleged that the defendant violated the Computer Fraud and Abuse Act and other federal statutes and misappropriated trade secrets.

It is well established that competition laws cannot be used by competitors to regulate product design except in the most limited circumstances involving monopolization or an attempt to monopolize. *See United States v. Microsoft Corp.*, 253 F.3d 34, 75 (D.C. Cir. 2001) ("A monopolist does not violate the antitrust laws simply by developing a product that is incompatible with those of its rivals. In order to violate the antitrust laws, the incompatible product must have an anticompetitive effect that outweighs any procompetitive justification for the design."); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979) ("[A]ny firm, even a monopolist, may generally bring its products to market whenever and however it chooses."). The policies behind this rule were explained in *Berkey Photo* as follows:

> [N]o one can determine with any reasonable assurance whether one product is 'superior' to another. Preference is a matter of individual taste. The only question that can be answered is whether there is sufficient demand for a particular product to make production worthwhile, and the response, so long as the free choice of consumers is preserved, can only be inferred from the reaction of the market.

*Berkey Photo, Inc.*, 603 F.2d at 287. Two decades later, the D.C. Circuit provided the following additional guidance:

> As a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes….In a competitive market, firms routinely innovate in the hope of appealing to consumers, sometimes in the process making their products incompatible with those of rivals; the imposition of liability when a monopolist does the same thing will inevitably deter a certain amount of innovation. This is all the more true in a market, such as this one, in which the product itself is rapidly changing.

*Microsoft Corp.*, 253 F.3d at 65 (holding that Microsoft's development of its own version of the Java Virtual Machine that was incompatible with its rivals was not predatory).

Similarly, the courts have rejected all efforts by competitors to assert claims based on high switching costs except when those switching costs create a potential for market power in a

derivative aftermarket.[4]  *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072 (1992).   They also have largely rejected competition claims based upon a defendant's refusal to cooperate with its competitor.   In so doing, the courts have recognized that the competition laws "favor competition of all kinds, whether or not some other producer thinks the competition is 'fair.'   Much competition is unfair, or at least ungentlemanly; it is designed to take sales away from one's rivals.   There is no obligation to be kindly or cooperative toward other producers."  *Sanderson v. Culligan International Co.*, 415 F.3d 620, 623 (7th Cir. 2005).

Thus, "failure to cooperate with a rival" claims must be based on a monopolization theory and can "withstand a motion to dismiss only when it is alleged either that the defendant had previously 'engaged in a course of dealing with its rivals, or [that it] would ever have done so absent statutory compulsion.'"  *Covad Comms. Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 673

---

[4] In *Universal Avionics Systems Corp. v. Rockwell International Corp.*, 184 F.Supp.2d 947, 955 (D. Ariz. 2001), the court stated that the following four factors must all be satisfied "in order to conclude that a *Kodak* lock-in market exists":

    1. High "switching costs": A substantial number of customers must have made brand-specific investments that still have a useful life but that are substantially unrecoverable if they shift to other brands;

    2. High "information costs": A substantial number of those customers must be too ignorant of "lifecycle" prices to protect themselves by judicious interbrand comparisons or by contract before they become locked in;

    3. Ability to exploit ignorant customers: The knowledgeable customers who can protect themselves must either be unimportant to the defendant or be protected by effective price discrimination from above market prices paid by the ignorant; and

    4. Ability to exploit must be "substantial": The defendant's resulting ability to exploit the ignorant must be "substantial."

*Id.*  The court explained that a "plaintiff faces a *substantial* burden to overcome the presumption under the antitrust laws that 'normal' market forces are at work.  He 'must offer enough evidence to allow a reasonable jury to conclude that each element of a substantial lock-in claim . . . is more likely than not present.'"  *Id.* (quoting X. Areeda, et al., Antitrust Law ¶ 1740, at 168).

(D.C. Cir. 2005) (quoting *Verizon Comm., Inc. v. Curtis V. Trinko, LLP*, 540 U.S. 398, 124 S.Ct. 872 (2004)); *see also Jefferson Parish Hospt. Dist. No. 2. v. Hyde*, 466 U.S. 2, 45, 104 S.Ct. 1551, 1576 (1984) ("Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.") (O'Connor, J., concurring).

Here, Cake Marketing complains that WebApps deliberately designed its product in such a way that it made it more cumbersome and expensive for customers to switch to competitive products. Cake Marketing does not allege that WebApps is a monopolist or has attempted to monopolize a relevant market. Nor does it allege that competition has been foreclosed generally or that market forces are not at play. Indeed, according to the Counterclaim, Cake Marketing is soliciting and transitioning customers to its product successfully. Counterclaim ¶ 14. The economic principles set forth above make it clear that absent monopolization or dangerous probability of a monopoly, product designs that allegedly make it more difficult for customers to switch to competitive products do not constitute unreasonable restraints of trade. The reason is simple: the market (not the courts) should determine whether one product is superior to another.

> **B.**     **The Unfair Trade Practice Claims Fail As A Matter Of Law Because Competition Is Not Harmed Because WebApps Could Not Restrain Trade By Sending An E-mail to Its Own Customer Base About Its Own Product.**

Cake Marketing also alleges that WebApps engaged in unfair competition by making a false statement about the legality of Cake Marketing's efforts to access the WebApps system, the subject of the underlying lawsuit against Cake Marketing. This same type of allegation also was made in *MCS Services* and was summarily dismissed because "[f]alse statements about a rival's goods do not curtail output in either the short or long run. They just set the stage for competition in a different venue: the advertising market." *MCS Services, Inc.* 2011 WL2443714 at *7 (quoting *Sanderson v. Culligan International Co.*, 415 F.3d 620, 623 (7th Cir. 2005)). The Fifth

Circuit has similarly held that "making nasty comments" about a competitor's business practices does not constitute an unreasonable restraint of trade because it does not suggest an adverse impact on competition. *Broyles v. Wilson*, 3 F.3d 349, 1993 WL 347222, *5 (5th Cir. 1993). Moreover, even if a false statement could injure competition, Cake Marketing has not alleged any facts to suggest that it suffered any injury. The alleged statement does not name Cake Marketing, but rather refers to a "competitor" generically. Cake Marketing also does not allege that it has lost any customers as a result of the statement. Rather, Cake Marketing alleges that the statement has caused customers "to hesitate before conducting business with Cake Marketing." Counterclaim ¶ 40. Cake Marketing also admits that WebApps directed the e-mail to its own customer base, not to Cake Marketing's customers. *Id.* ¶ 27. In short, a competitor simply cannot complain that an e-mail which does not mention the competitor and was directed by a rival to the rival's own customer base foreclosed competition.

### C. The Unfair Trade Practice Claims Fail As A Matter Of Law Because Cake Marketing Has Not Alleged Any Facts Which Would Support A Finding That The Alleged Anticompetitive Conduct Injured Competition.

In order to show that a restraint is unreasonable and, hence, unfair, the "[a]lleged anticompetitive conduct must have an adverse impact on competition, in general, not simply hurt a single competitor." *Broyles*, 1993 WL 347222 at *4. The determination of whether competition has been foreclosed begins with defining a relevant market and a determination of market power. *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412, 417 (5th Cir. 2010). In this case, Cake Marketing has not attempted to define a relevant market. Nor has Cake Marketing alleged any facts about the market which could provide any insight into whether WebApps has market power. Cake Marketing does not, for example, allege any facts related to barriers to entry, the number and relative size of the competitors in the marketplace, the number

and relative size of the customer base, pricing trends, or market structure and performance.[5]   The absence of these allegations is fatal to their unfair trade practice claims because, without them, Cake Marketing cannot prove injury to competition, the main thrust of California and Louisiana statutes.  *Leegin*, 615 F.3d at 417-18 ("Where the plaintiff fails to define its proposed relevant market . . . a motion to dismiss may be granted.").

### E.   Applying Louisiana Law, The Claims For Intentional Interference With Contract (Count 1) and Intentional Interference With Business Relations (Count 5) Fail As A Matter Of Law Under *Spurney*.

For reasons addressed in its Memorandum in Opposition to the Motion to Dismiss filed by Cake Marketing (Rec. Doc. 36), WebApps submits that the issues in this case should be resolved under Louisiana law.  If Louisiana law is applied to the intentional interference claims in Counts One and Five, the claims fail as a matter of law under *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La. 1989) and its progeny which limit intentional interference claims to interference with a contract by an officer of the breaching company.   Cake Marketing does not and cannot allege that WebApps is an officer of any company with which it has a contract. *Huffmaster v. Exxon Co.*, 170 F.3d 499, 504 (5th Cir. 1999) ("The [ Spurney ] Court specifically recognized only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person and disavowed any intention to adopt whole and undigested the fully expanded common law doctrine of interference with contract."); *Ingraffia v. NME Hosps., Inc.*, 943 F.2d 561, 566-67 & n. 2 (5th Cir. 1991) (noting that, "in Spurney, the court recognized a cause of action for tortious interference in extremely limited circumstances," and more specifically, in circumstances involving corporate

---

[5]   The absence of these allegations is not surprising.  Cake Marketing is a publicly traded company which has no factual basis for claiming that WebApps, a locally owned start up company, has the ability or wherewithal to bully Cake Marketing or any of its other competitors.

officers); *Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1, 5 n. 2 (5th Cir. 1992) (finding that the district court properly dismissed a tortious interference claim which did not involve a corporate officer, because "[f]ederal courts have respected the restricted nature of this new delict"); *Gulf States Land & Dev., Inc. v. Premier Bank, N.A.*, 956 F.2d 502, 508 (5th Cir. 1992) (refusing to apply the "limited" exception to the general bar against tortious interference claims in a case which did not involve an officer of a private corporation).

<div style="margin-left:2em">

**F.      Applying California Law, The Claims For Intentional Interference With Contract (Count 1) and Intentional Interference With Business Relations (Count 5) Fail As A Matter Of Law Because Any Conduct By WebApps Which Does Not Constitute A Restraint Of Trade Is Privileged.**

</div>

California law has long recognized a "competition privilege" which applies to claims for interference with prospective economic advantage and to existing contracts that are terminable at will.[6] *See San Francisco Design Ctr. Assocs. v. The Portman Cos.*, 41 Cal.App.4th 29, Cal.Rptr.2d 716 (1995), review dismissed, remanded and ordered published by 50 Cal.Rptr.2d 698, 911 P.2d 1373 (1996).  "In order to defeat the privilege the defendant's conduct must be unlawful or illegitimate. That is, when a claimant charges its competitor with interference with prospective economic advantage and the competitor raises the competition privilege as a defense, the claimant must show the competitor's conduct violated a statute or constituted a tort such as fraud or unfair competition. The defendant's conduct must be independently actionable."  *Id*. at 29, 50 Cal.Rptr.2d at 723.  As set forth above, Cake Marketing has not alleged any conduct that constitutes a restraint of trade or is otherwise actionable as an unfair trade practice.  As such, the

---

[6]  Cake Marketing alleges that it has contracts with three former customers of WebApps – AffiliateWise, LLC, Moore International, LLC, and PAB67 Media, LLC – (Counterclaim ¶ 30) but does not allege any facts to support the conclusion that its contracts with them are for a defined period of time or otherwise not terminable at will.  In the absence of such allegations, the competition privilege applies equally to the intentional interference with contract and intentional interference with business relations claims.

intentional interference claims fail as a matter of law.  *See also MCS Services, Inc.*, 2011 WL2443714 at *7 (dismissing intentional interference with business relations counterclaim because defendant failed to allege facts to support a finding of restraint of trade).

> **G.    Applying California Law, The Intentional Interference With Contract Claim (Count 1) Fails As A Matter Of Law Because The Alleged Conduct Which Purportedly Disrupted The Contract Occurred <u>Before</u> Cake Marketing Had A Contract To Disrupt.**

In order to prevail on its claim for intentional interference with contract under California law, Cake Marketing must prove: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages.  Cake Marketing cannot prevail on this claim because the alleged conduct which caused the purported disruption occurred before Cake Marketing had a valid contract with any of its customers.  Specifically, Cake Marketing alleges that its contracts were disrupted because "Cake Marketing had to shoulder the burden of paying a consultant to engage in data retrieval and because Cake Marketing does not make money from customers during downtime before the data is inputted and the system is thus up and running." Counterclaim ¶ 33.  Cake Marketing further alleges that the burden associated with the data retrieval was a function of the structure of its web portal (*Id.* ¶¶16-17), that WebApps "could have developed more robust APIs to enable customers to more easily and expeditiously retrieve their data" (*Id.* ¶ 18) and that it did "not inform customers about these tactics at the time of contract formation."  *Id.* ¶ 37.  Thus, according to Cake Marketing's own allegations, WebApps adopted the alleged tactics that Cake Marketing is complaining about when WebApps contracted with its customers not at or near the time Cake Marketing contracted with its own customers.  In

order to state a viable claim for intentional interference with contract, Cake Marketing cannot

rely on alleged conduct which occurred before it had a contract which could be interfered with.

**H.    Applying California Law, The Intentional Interference With Business Relations Claim (Count 5) Fails As A Matter Of Law Because The Alleged Conduct Which Purportedly Disrupted The Business Relations Occurred <u>Before</u> Cake Marketing Had A Relationship To Disrupt.**

In order to prevail on its claim for intentional interference with contract under California

law, Cake Marketing must prove: (1) an established economic relationship with a third party

which created a reasonable probability of future economic benefit for Cake Marketing; (2)

WebApps' knowledge of that relationship; (3) deliberate action by WebApps to disrupt that

relationship; (4) disruption of the relationship; and (5) proximately caused economic harm.  *See*

*Westside Center Assoc. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521-22, 49 Cal. Rptr. 2d

793 (1996).  Like its intentional interference with contract claim, Cake Marketing alleged that its

business relations are disrupted by the functionality of WebApps' product.  Cake Marketing

essentially claims that it would incur lower costs if the WebApps product functioned better.  This

theory fails for the same reason that the intentional interference with contract claim failed;

namely, Cake Marketing cannot rely on alleged conduct which purportedly occurred before it

had a business relationship to support an intentional interference with business relations claim.

**I.    The Declaratory Judgment Counterclaim (Count 3) Fails As A Matter of Law Because It Is Redundant of the Complaint.**

Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the Court has complete

discretion whether to hear a counterclaim for declaratory judgment.  Decisions from the modern

era "agree that mirror image counterclaims are improper" and should be dismissed.  *Pettrey v.*

*Enterprise Title Agency, Inc.*, 2006 WL 3342633, *2 (N.D. Ohio Nov. 17, 2006) (collecting

cases).  In this case, the declaratory judgment counterclaim shares a complete identity of factual

and legal issues with the claims asserted by WebApps.  Nothing in the counterclaim would

entitle Cake Marketing to any costs or fees beyond those it might otherwise be entitled to as a result of successfully defending the lawsuit or give Cake Marketing any other strategic advantage.   Because Cake Marketing does not stand to gain or lose anything through the declaratory judgment counterclaim, the counterclaim is redundant and superfluous and should be dismissed.

## CONCLUSION

For the reasons set forth above, WebApps respectfully requests that the Court enter an order dismissing Counts 1-5 of the Counterclaim.

Respectfully submitted,


/s/ Mark A. Cunningham
MARK A. CUNNINGHAM (#24063)
BRETT S. VENN (#32954)
Jones, Walker, Waechter,
   Poitevent, Carrère & Denègre, L.L.P.
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
Telephone:  (504) 582-8000
Facsimile: (504) 582-8583
mcunningham@joneswalker.com
bvenn@joneswalker.com

Attorneys for WebApps, LLC.

## CERTIFICATE OF SERVICE

I certify that a copy of this motion has been served on all counsel of record counsel by filing same with this Court's CM/ECF system or by depositing same in the United States mail, postage prepaid and properly addressed, this 12th day of August, 2011.


/s/ Mark A. Cunningham
MARK A. CUNNINGHAM